UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

Mary McGowan,

        Plaintiff,

v.

                                    Civil No. 11-502 (JNE/JJK)
                                    ORDER

Service Employees International Union,
Local #113 a/k/a SEIU Healthcare Minnesota,
and Group Health Plan, Inc.,

        Defendants.

---

Trevor S. Oliver, Esq., Kelly & Lemmons, P.A., appeared for Plaintiff Mary McGowan.

Justin D. Cummins, Esq., and Roger A. Jensen, Esq., Miller O'Brien Cummins, PLLP, appeared for Defendant Service Employees International Union, Local #113.

Paul J. Zech, Esq., and Jessica M. Marsh, Esq., Felhaber Larson Fenlon & Vogt, PA, appeared for Defendant Group Health Plan, Inc.

---

This is an action brought by Mary McGowan under section 301 of the Labor Management Relations Act. She claims her former employer, Group Health Plan, Inc., breached a collective bargaining agreement by suspending and discharging her without just cause. She also claims the union that represented her, Service Employees International Union, Local #113 (SEIU), breached its duty of fair representation by failing to pursue grievances of her suspension and discharge. The case is before the Court on Group Health Plan's and SEIU's motions for summary judgment. For the reasons set forth below, the Court grants the motions.

## I.     BACKGROUND

After earning a nursing degree in 2003, McGowan worked for approximately two years at a hospital as a post-partum nurse. From 2005 to 2010, she was employed by Group Health Plan at a clinic in St. Paul, Minnesota. McGowan was also a member of SEIU. Group Health Plan

and SEIU were parties to a collective bargaining agreement that governed certain terms and

conditions of her employment.  The collective bargaining agreement provided: "Disciplinary

action may be imposed upon an Employee only for just cause and shall be progressive, where

appropriate.  The parties recognize that serious offenses may require the imposition of more

severe discipline as an initial action."

For most of her employment at the clinic, McGowan worked as a "triage nurse" in its

OB/GYN practice.  Her primary duties included answering phone calls from patients and

assessing a patient's need for care.  Occasionally, McGowan worked "on the floor" to provide

care to patients.  In July 2010, McGowan's responsibilities as a triage nurse expanded to include

patients of the clinic's infertility practice.

In late July, McGowan's supervisor, Kari Perrin, talked to McGowan about a patient

whose request for a prescription was denied.  Perrin documented the conversation:

> It was brought to my attention by provider DA that she received a phone call at home on her day off from one of her ob patients.  The patient had called the clinic and talked with [McGowan] regarding c/o nausea/vomiting in pregnancy and request for medication to help.  The patient had tried the recommended Vit B6 and Unisom and this was not helping.  The patient states she informed [McGowan] that DA had told her to call back if Vit B6 & Unisom did not work and the clinic would Rx reglan for her.
>
> The patient informed DA while the nurse . . . was very nice, the nurse . . . told the patient that DA would not be in clinic for a couple of days and so there was nothing she could do for her at that time.  [McGowan] informed the patient she would leave a note for DA and have it addressed when she returns to clinic.  The patient informed DA that she just couldn't wait and this is the reason she is calling at home.
>
> When I asked [McGowan] about the incident she states this is not true, she asked the patient if she was ok to wait and per [McGowan] the patient told her she was fine to wait.
>
> I advised [McGowan] in the future it is expected that she discuss with another provider and take care of the situation when the same day the[] patient call.  [McGowan] states understanding.

At her deposition, McGowan testified that she was never disciplined for this event.

Later in July, Perrin documented another conversation that she had with McGowan about providing patient care and the expectations of a registered nurse:

> Discussed with [McGowan] her refusal to help a co-worker (LPN) with an injection that she asked [McGowan] to help with due to the fact she had never given it before and was not familiar with it. Also discussed the fact that [McGowan] refused to help out, when asked to provide education to a patient regarding their ob care. The LPN reported that she went to [McGowan], and asked her to assist because she is the RN for the care team she works in. [McGowan] informed the co-worker (LPN) she didn't know how to give the injection and would need to ask one of the other nurses. It was also reported by her co-workers that when [McGowan] was asked to help with some patient education she stated "I can't, I don't know how."

> I asked [McGowan] what I could do to help her so that she would feel confident in assisting her co-workers as well as the patients with patient care tasks such as giving an injection are [sic] needed. [McGowan] responded "I guess I need to just do it." I again asked her if I could provide further training and she said "no, I just need to do it."

> I also questioned [McGowan] as to why she didn't help her co-worker when asked to provide education. "I've never done it before." It was discussed that as an RN she has the education and background to provide education without having any training within the clinic setting. Informed [McGowan] she gives the patient the education book/packet and answers any questions the patient may have. If she doesn't know the answer she should let the patient know she will find out and get back to her. [McGowan] also signed a skill assessment statement which she indicated she felt very comfortable providing patient education. I advised [McGowan] that it is an expectation that the care team RN serves as a resource to other nursing staff and that is not acceptable to refuse.

> [McGowan] was informed I will not accept her refusal to do things, if she is uncomfortable with the task she should ask a co-worker to partner with her, but again it is not acceptable to just refuse to do something. She states she understands.

At her deposition, McGowan disputed most of what Perrin had documented.

In early August 2010, Perrin talked to McGowan about failing to refer a patient for testing. Perrin documented the conversation:

> It was brought to my attention by another RN that there was a note in the care team C in-basket dated 7/28/2010 from provider CF that she had notified a

3

patient of positive quad screen and to send a referral to MPP for CVS testing; patient's quad screen was positive for down's syndrome.  The nurse stated that it had not been dealt with and that the patient was 12wks one day as of 8/2/10.  (The CVS testing has a window of opportunity to be done and must be done by 12 wks 6 day gestation).  The nurse that brought this to my attention took care of it on 8/2/10 and was told by MPP that they usually wouldn't do the test after 12 wks gestation, however, since there was a high ratio 1:10 for down's syndrome, they could still perform the testing if done immediately, the nurse scheduled the patient to have testing done on 8/4/10 with MPP's assistance.

[McGowan], RN is the nurse assigned to care team C and works 9 days a pay period. [McGowan] was working on 7/28, 7/29 and 7/30 and did not take care of this assignment nor did she close the note from the in-basket.  When asked why it had not been taken care of her response was "I guess I just assumed that Carol sent the referral."  When I advised [McGowan], when I look read the note I have the understanding CF is asking that this task be completed.  [McGowan's] response was "well, I guess I just don't have a good understanding of how CF communicates yet."  I informed [McGowan] that this is very serious and asked if she understood there is a very small window of opportunity to provide the CVS testing.  Also asked [McGowan] if she was unsure it had been taken care of why would she just assume.  She replied, "it was just a lack of knowing how to communicate with CF."  I also asked [McGowan] why she would leave the note opened if she understood "assumed" it was taken care of.  She stated she left [it] opened so that she could watch for the results of the CVS.  I informed [McGowan] this was not a good practice as there is no documentation to support that anything has been done with it and if it isn't documented it wasn't done.  It also leaves a co-worker to believe that it is something that needs to be dealt with in the event they are covering for her.

I advised [McGowan] that in the future it is expected she will not "assume" that anything is complete.  If she is unsure she is to check with the provider and ensure that it is taken care of in a timely manner.  This assumption can result in a sentinel event.  [McGowan] states understanding to the expectation.

According to her deposition testimony, McGowan read the note to mean that the patient had already been referred for testing.  She denied stating that she had assumed the referral had taken place.

On August 12, 2010, Group Health Plan held a meeting as part of an investigation of McGowan's performance.  McGowan, Perrin, a union representative, and the supervisor of family practice attended the meeting.  Eleven days later, Perrin met with several nurses, including McGowan, to clarify expectations related to notifying patients of lab results.  Later that

day, Group Health Plan suspended McGowan for three days.  Perrin wrote McGowan a letter that summarized the basis of the suspension.  The letter mentioned McGowan's failure on July 13, 2010, to notify a patient of a positive test for Chlamydia and the need for treatment; her failure to report the positive test to the Minnesota Department of Health; her failure to act on the July 28 request to refer the patient for CVS testing because of the patient's positive quad screen; and her failure on July 30 to assist with the injection.  At her deposition, McGowan testified that she had not contacted the patient about the positive test for Chlamydia because no telephone number or address was available and that she had not notified state authorities about the test because she had anticipated the patient would be treated at an upcoming appointment. McGowan served the suspension from August 24 to 26, 2010.

McGowan returned to work on August 27.  That day, SEIU filed at her request a grievance of her suspension.  Three days later, Group Health Plan placed McGowan on a paid investigatory suspension and directed her to attend a meeting on August 31.  Group Health Plan also stated that she had the right to union representation.

At the meeting on August 31, Group Health Plan discussed five incidents with McGowan.  Four occurred on August 27; the fifth took place on August 30.  According to McGowan's deposition testimony, the first incident related to a note issued by a care line about a patient who had abdominal pain for several days, had a prescription, and wanted to know whether she could obtain a note excusing her from a shelter.  McGowan sent the note to a doctor, but she did not triage the patient.  In retrospect, McGowan would have triaged the patient.  Next, McGowan did not call a patient at risk for an ectopic pregnancy to give the patient lab results and a plan.  McGowan explained: "I . . . saw her lab result and typically we would call, give them their lab result and a plan.  I noticed that she already had reviewed this with a different nurse

because she was traveling . . . and wanted to make sure she could travel." McGowan did not think she would have acted otherwise because the patient had a plan, but she acknowledged Group Health Plan genuinely believed she should have. Third, McGowan misinterpreted a direction to schedule surgery as a direction to schedule an ultrasound. She acknowledged that the mistake merited a face-to-face discussion. Fourth, McGowan did not call a patient who had left a message about bleeding. McGowan testified that she did not see the message and that it "absolutely" would have been better to have called the patient. Finally, McGowan attempted to contact a patient who required immediate follow-up due to critical calcium levels, spoke to the patient's husband, declined his request for more information, asked him to tell the patient to schedule an appointment that day, called again and left a message approximately 90 minutes later, and informed the patient's primary doctor of the patient's calcium level. McGowan testified that no work number was available for the patient, that she did not recall whether Group Health Plan had asked why she had not checked for an emergency contact number, and that Group Health Plan did not believe she needed to notify the primary doctor. McGowan testified that she "can see [Group Health Plan] having questions" about how she handled the patient. Noting the subjective nature of the decisions made by triage nurses, McGowan nevertheless acknowledged that the five patients raised legitimate questions. At the end of the meeting on August 31, Group Health Plan directed McGowan to report to human resources the next day.

Group Health Plan terminated McGowan's employment on September 1. A letter signed by Perrin explained:

> I recently completed an investigation . . . . The results of that investigation showed that upon your return from your suspension you again failed to triage 4 OB patients on August 27 and 1 OB patient in the morning of August 30. Specifically, you admitted in the investigation to not calling patients back, not taking action on labs and diagnostic tests and not appropriately following up with the care teams and that you just sent the information on the patient to other

sources instead of triaging them.  Your role as an RN is to appropriately triage
patients and to do so in a timely manner.  Your failure to do so placed the safety
of our patients' health at risk.  The Employer will not tolerate these types of
behaviors.

Asserting that it had terminated her for misconduct, Group Health Plan disputed

McGowan's eligibility for unemployment benefits.  In November 2010, an unemployment law

judge concluded that she was discharged for reasons other than employment misconduct.  The

unemployment law judge explained:

It is not the Judge's intent to pass judgment on or second-guess the decision of
[Group Health Plan] to discharge McGowan.  The issue before the Judge is not
whether [Group Health Plan] was justified in discharging her.  The only issue the
Judge has the authority to address is whether, now that she has been discharged,
she also should be denied unemployment benefits on the grounds that her
discharge was for reasons of employment misconduct within the meaning of the
Minnesota Unemployment Insurance Law.  The Judge notes that McGowan
received a very favorable performance review from her team leader for a period
of time that included the 1st quarter of 2010.  The team leader had the opportunity
to work with and observe McGowan's performance much longer than did Perrin.
There was no evidence that the team leader shared Perrin's concerns about
McGowan's performance.  McGowan's performance appeared to become an issue
four months after Perrin became her supervisor and less than one month after
changes in the clinic's operations were implemented.  The Judge seriously
questions whether McGowan's performance could have deteriorated to such a
significant degree in such a short period of time.  It appears more likely that
Perrin and [the clinic specialty operations manager] raised the bar substantially
with respect to the clinic's performance expectations for its nursing staff and that
McGowan was unable to meet these higher expectations.  In light of these
considerations, and keeping in mind the provisions of [sections of the Minnesota
Unemployment Insurance Law], the Judge concludes that while McGowan's
conduct may have been unsatisfactory, a preponderance of the evidence does not
support a finding that she was discharged for reasons of employment misconduct
within the meaning of [the Minnesota Unemployment Insurance Law].

On September 17, 2010, SEIU filed at McGowan's request a grievance of her discharge.

After submission of a grievance of a suspension or discharge, the collective bargaining

agreement called for Group Health Plan and SEIU to schedule a meeting within 20 days and for

Group Health Plan to respond to the grievance within 10 days of the meeting.  If the grievance is

not satisfactorily resolved, then SEIU may appeal within 20 days of receiving Group Health

Plan's response; Group Health Plan and SEIU schedule a meeting within 20 days; and Group

Health Plan responds within 20 days of the meeting.  If the grievance is still not satisfactorily

resolved, then SEIU may submit a demand for arbitration within 60 days of receiving Group

Health Plan's response.  McGowan's grievances did not follow this schedule.

According to the affidavit of Tara Wangen, who is employed by SEIU to process member

grievances, SEIU made several unsuccessful attempts to meet with Group Health Plan in the fall

of 2010 and winter of 2011 about McGowan's grievances.  Wangen stated that Group Health

Plan mistakenly thought SEIU had not submitted a grievance of McGowan's discharge and that

Group Health Plan thought the suspension grievance was pointless in light of McGowan's

discharge.

SEIU's Case Details Report indicates that Wangen and McGowan exchanged e-mails in

early October 2010 about the resolution sought by McGowan.  The next day, SEIU employees

discussed McGowan's request for reinstatement in light of her earlier statement that she did not

want to be reinstated.  Wangen also called McGowan and stated that a meeting had not yet been

scheduled.  The same month, McGowan submitted a rebuttal regarding her termination to SEIU.

SEIU asked her to submit it to Group Health Plan, and McGowan did so in late October.  On

January 6, 2011, McGowan called SEIU and asked for an update.  After returning McGowan's

call, Wangen made the following notion in the Case Details Report:

> I called [McGowan] back & we had a very long conversation regarding
> her grievances.  This is a looser [sic] as her excuses all come down to "we are
> afraid of the employer-managers".  Many, many mistakes that gave the employer
> plenty of opportunity to move her right out the door.  I will try to speak with Mike
> Deluca & get this case closed.

After speaking with Michael DeLuca, who worked in Group Health Plan's human resources

department, later that day, Wangen made the following notation in the Case Details Report: "I

spoke with Mike & he has the suspension grievance, but has no grievance for the termination. He will ask the manager if she received it & why not forwarded to him."

On January 24, 2011, Wangen and McGowan's attorney spoke.  According to Wangen, the attorney indicated that McGowan was going to file an action for age discrimination against Group Health Plan.  Wangen understood that McGowan wanted to abandon her grievances and pursue a claim of age discrimination.  At his deposition, the attorney confirmed that he had mentioned to Wangen McGowan's consideration of a claim of age discrimination.

By letter dated January 31, 2011, SEIU informed McGowan that it had decided "not to pursue [her] grievances further" and that she had a right to appeal the decision to its Executive Board Appeals Committee.  McGowan appealed.

On February 16, 2011, SEIU's Executive Board Appeals Committee heard McGowan's appeal.  The committee panel that heard McGowan's appeal included Tracy Stankovich, a registered nurse; Renee Burman, a licensed practical nurse; and Jamie Gulley, the Executive Vice President of SEIU Healthcare Minnesota.  Stankovich worked as a registered nurse for approximately 16 years, handled OB/GYN and triage functions for approximately 13 years, and is familiar with industry standards and job requirements for registered nurses.  Burman worked as a licensed practical nurse for approximately 35 years, handled OB/GYN and triage functions for most of her career, and is familiar with industry standards and job requirements for nurses. At the beginning of the hearing, Gulley asked McGowan to explain why Group Health Plan lacked just cause to suspend and discharge her.  For approximately one hour, McGowan discussed the events that resulted in her suspension and discharge, as well as why the union should take her grievances to arbitration.  McGowan also presented a chronology prepared by her attorney to the committee panel.

The committee panel recommended that McGowan's appeal be denied.  By affidavit,

Stankovich explained the recommendation:

> 4.      Based on the information covered during the hearing proceedings and our careful deliberations afterward, it was obvious to me that it was highly unlikely SEIU could win an arbitration of [McGowan's] grievances because of [her] admitted conduct, including not informing a patient or the State about a positive Chlamydia test result for that patient or the need for prompt medical treatment, not informing a patient of a test result indicating that patient's unborn child may have Down's syndrome or the need for prompt medical follow up, and the failure to assist a colleague with performing an injection concerning a patient under the care of [McGowan's] employer.
>
> . . . .
>
> 6.      I was appalled by [McGowan's] admitted failure to notify a patient or the State of a positive Chlamydia test result and the need for prompt medical treatment, and I was surprised by [her] unwillingness to assist with injections given her years as a registered nurse.  Giving shots is something registered nurses know how to do and perform soon after graduating from nursing school, if not before then.  As a registered nurse, [McGowan's] admitted failure to triage a number of patients also was improper and grounds for suspension and discharge.

Burman's affidavit contained the same explanation.  Gulley's affidavit contained essentially the

same explanation as paragraph 4 of Stankovich's affidavit.  In addition, Gulley stated: "SEIU has

lost prior arbitrations in similar cases and, for that reason, SEIU has decided not to take other

similar cases to arbitration in the past.  The committee panel voted unanimously to recommend

denial of [McGowan's] appeal because of the conduct to which [she] admitted."

SEIU's Executive Board accepted the recommendation to deny McGowan's appeal.  By

letter dated February 24, 2011, SEIU attempted to inform McGowan that her appeal had been

denied.  The letter was erroneously sent to another member of the same name.  Upon learning of

the error, SEIU sent a letter to McGowan in early April 2011 informing her that her appeal had

been denied.

On February 25, 2011, McGowan filed a charge with the National Labor Relations

Board.  She claimed that SEIU had violated the National Labor Relations Act.  In early March

2011, SEIU requested McGowan's personnel file from Group Health Plan.  On April 29, 2011,

the Regional Director of the National Labor Relations Board declined to issue a complaint and

dismissed McGowan's charge.  The Regional Director reasoned:

> As a result of the investigation, it appears that there is insufficient
> evidence to establish that the Union violated the [National Labor Relations] Act,
> as alleged.  The investigation established that you were suspended and then
> discharged in late August 2010; that the Union filed grievances concerning both
> matters; that the Union apparently failed to do anything of consequence
> concerning your discharge grievance for approximately 60 days; that although the
> Employer claimed that no grievance was ever filed concerning your discharge, the
> Union eventually concluded based on its evaluation of the merits that it was
> unlikely to prevail if it arbitrated this grievance; and that the Union's Executive
> Board rejected your appeal of this conclusion.  Even assuming the Union was
> negligent in failing to process your grievance in a more timely fashion, the
> investigation failed to establish that the Union processed your grievance in a
> perfunctory manner, or that the Union's decision not to arbitrate your grievance
> was arbitrary, discriminatory or made in bad faith.

McGowan appealed the Regional Director's decision.  On June 21, 2011, the Office of the

General Counsel of the National Labor Relations Board denied McGowan's appeal

"substantially for the reasons set forth in the Regional Director's letter of April 29, 2011."  The

Office of the General Counsel added the following explanation:

> The Regional Office investigation adduced sufficient evidence to establish
> that the Union met its obligation to fairly and properly represent the alleged
> discriminatee regarding her work-related complaints and the processing of her
> grievances. . . .

> In this matter, despite the conflicting evidence, the investigation revealed
> sufficient evidence to establish that the Union filed and processed a discharge
> grievance on behalf of the alleged discriminatee.  The evidence further revealed
> that the Union eventually presented it to the Union Executive Board Appeal
> Committee.  This Committee consisted of rank and file union members, union
> officials, and an expert on the issues presented in this grievance.  The alleged
> discriminatee also attended the meeting and presented her version of the events
> that resulted in her suspension and discharge.  The Committee reviewed the
> evidence, compared it to the acceptable standards in the industry, and concluded
> that the alleged discriminatee's grievance lacked sufficient merit to present to an
> arbitrator.  In these circumstances, it could not be concluded that the Union
> violated Section 8(b)(1)(A) of the [National Labor Relations] Act, as alleged.  In
> this connection, the investigation revealed no evidence that the Union's actions

were based on unlawful reasons.  Likewise, any delays in the processing of the grievance or any failure to provide information relating to the grievance-arbitration procedures was also not based on any unlawful considerations. Accordingly, further proceedings are unwarranted.

## II.    DISCUSSION

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To support an assertion that a fact cannot be or is genuinely disputed, a party must cite "to particular parts of materials in the record," show "that the materials cited do not establish the absence or presence of a genuine dispute," or show "that an adverse party cannot produce admissible evidence to support the fact."  Fed. R. Civ. P. 56(c)(1)(A)-(B).  "The court need consider only the cited materials, but it may consider other materials in the record."  Fed. R. Civ. P. 56(c)(3).  In determining whether summary judgment is appropriate, a court must look at the record and any inferences to be drawn from it in the light most favorable to the nonmovant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

In this "hybrid" action brought under section 301 of the Labor Management Relations Act, McGowan "must prove both that [SEIU] breached its duty of fair representation and that [Group Health Plan] breached the collective bargaining agreement" to prevail against either Group Health Plan or SEIU.  *Scott v. United Auto.*, 242 F.3d 837, 839 (8th Cir. 2001); *see Miner v. Local 373, Int'l Bhd. of Teamsters*, 513 F.3d 854, 860 (8th Cir. 2008).  The Court begins with McGowan's assertion that SEIU breached its duty of fair representation by failing to pursue her grievances against Group Health Plan.

"The duty of fair representation is breached if the union's conduct is 'arbitrary, discriminatory, or in bad faith.'"  *Gaston v. Teamsters Local 600*, 614 F.3d 774, 778 (8th Cir. 2010) (quoting *Smith v. United Parcel Serv., Inc.*, 96 F.3d 1066, 1068 (8th Cir. 1996)).

McGowan claims that SEIU engaged in arbitrary conduct.  She maintains that SEIU "did absolutely nothing" to process her grievances, that it failed to investigate them, and that the failure to investigate tainted her appeal to the committee panel.  SEIU and Group Health Plan assert that McGowan cannot demonstrate the SEIU engaged in arbitrary conduct.

"Mere negligence, poor judgment or ineptitude on the part of the union is insufficient to establish a breach of the duty of fair representation.  For a union's conduct to be arbitrary it must be so far outside a wide range of reasonableness as to be irrational." *Id.* (citation omitted) (internal quotation marks omitted).  "A union does not act arbitrarily simply because it does not pursue a grievance that it has decided lacks merit.  This is true even if a judge or jury later determines that the grievance is meritorious." *Sanders v. Youthcraft Coats & Suits, Inc.*, 700 F.2d 1226, 1229 (8th Cir. 1983).  "A union owes a duty to all members of the bargaining unit, therefore 'the union has the affirmative duty not to press grievances which the union believes, in good faith, do not warrant such action.'" *Cross v. United Auto Workers, Local 1762*, 450 F.3d 844, 847 (8th Cir. 2006) (quoting *Sanders*, 700 F.2d at 1229).  "It is the Union, not the individual employee, who decides how to proceed and whether to submit a grievance to arbitration." *Hansen v. Qwest Commc'ns, Corp.*, 564 F.3d 919, 926 (8th Cir. 2009).

"[A]rbitrary decision-making as to the merits of an employee's grievance may, in some circumstances, be shown where the union ignores the employee's complaint or processes the employee's grievance in a perfunctory manner." *Martin v. Am. Airlines, Inc.*, 390 F.3d 601, 606 (8th Cir. 2004).  "[P]erfunctory conduct is actionable only if it is irrational 'in light of the factual and legal landscape at the time of the union's actions.'" *Schmidt v. Int'l Bhd. of Elec. Workers, Local 949*, 980 F.2d 1167, 1169 n.4 (8th Cir. 1992) (quoting *Air Line Pilots Ass'n, Int'l v. O'Neill*, 499 U.S. 65, 67 (1991)).  "A union acts in a perfunctory manner when it acts 'without

concern or solicitude' or gives a member's grievance 'only cursory attention.'" *Martin*, 390 F.3d at 606 (quoting *Brown v. Trans World Airlines, Inc.*, 746 F.2d 1354, 1357 (8th Cir. 1984)).

In this case, it is undisputed that SEIU filed the grievances at McGowan's request. At SEIU's request, McGowan submitted a rebuttal to Group Health Plan in October 2010. According to Wangen, SEIU's attempts to meet in the fall of 2010 with Group Health Plan were rebuffed. SEIU's Case Details Report does not reflect these attempts, and DeLuca's apparent discovery of the grievance discharge in early January 2011 suggests they may not have happened. In any case, SEIU apparently did nothing of consequence to advance McGowan's grievances for approximately two months. In early January 2011, McGowan sought an update. After a very long conversation with McGowan, Wangen deemed McGowan's case a "loser" and noted McGowan's "many mistakes" had given Group Health Plan "plenty of opportunity to move [McGowan] right out the door." Later that day, Wangen spoke to DeLuca and learned that he had not received the discharge grievance. Later in January, after McGowan's attorney had expressed McGowan's interest in pursuing a claim of age discrimination, SEIU issued a decision not to pursue her grievances. McGowan appealed, and the committee panel denied her appeal after giving her approximately an hour to present her case and considering a chronology prepared by her attorney. The panel's two nurses, each with many years of experience, found conduct in which McGowan admittedly engaged appalling. They thought it was "highly unlikely" that SEIU could prevail in an arbitration of McGowan's grievances. The panel's other member, the Executive Vice President of SEIU Healthcare Minnesota, indicated that SEIU had lost prior arbitrations in similar cases. At her deposition, McGowan herself acknowledged that her conduct raised legitimate questions.

Although McGowan criticized SEIU's consideration of her grievances, the alleged infirmities do not give rise to an inference of arbitrary conduct.  McGowan noted that SEIU requested her personnel file only after she had filed a charged with the National Labor Relations Board.  In her memorandum in opposition to the motions for summary judgment, she asserted that "more support for [her] arbitration case was likely available to [SEIU]."  At the hearing, McGowan criticized SEIU for not providing a more complete description of the "similar cases" in which SEIU either lost arbitrations or declined to pursue them to arbitration.  But McGowan has not identified what, if anything, additional investigation would have revealed that would have altered SEIU's assessment of her grievances.  McGowan had the opportunity to take discovery in this action.  Group Health Plan and SEIU noted McGowan's failure to take depositions of relevant individuals.  McGowan's complaints about an inadequate investigation and insufficient detail do not provide a basis to avoid summary judgment.

Perhaps McGowan's conduct was appalling, as the nurses on the committee panel found it to be.  Perhaps McGowan endangered the health of Group Health Plan's patients, as Perrin asserted in the termination letter.  Or it may be that McGowan failed to meet Group Health Plan's increased expectations of its nursing staff, as the unemployment law judge thought likely.  Or perhaps McGowan had a strong case that her discipline was excessive, as she asserted in her memorandum of law.  In any case, SEIU filed grievances at her request.  Although SEIU's assessment of the grievances was delayed, SEIU ultimately gave due consideration to them, concluded that it was unlikely to prevail in arbitration because of the conduct in which she admittedly engaged, and declined to pursue them.  Viewing the record in the light most favorable to McGowan, a reasonable finder of fact could not find that SEIU breached its duty of fair representation.  *See Cross*, 450 F.3d at 847.  The Court therefore grants SEIU's motion.

Having concluded that summary judgment in SEIU's favor is warranted, the Court also grants Group Health Plan's motion.  *See Washington v. Serv. Emps. Int'l Union, Local 50*, 130 F.3d 825, 827 (8th Cir. 1997) ("Because summary judgment in favor of the union was appropriate, we conclude summary judgment in favor of [the employer] was likewise proper.").

### III.    CONCLUSION

Based on the files, records, and proceedings herein, and for the reasons stated above, IT IS ORDERED THAT:

1.    SEIU's Motion for Summary Judgment [Docket No. 36] is GRANTED.

2.    Group Health Plan's Motion for Summary Judgment [Docket No. 45] is GRANTED.

3.    This case is DISMISSED WITH PREJUDICE.

LET JUDGMENT BE ENTERED ACCORDINGLY.

Dated: August 22, 2012

s/ Joan N. Ericksen
JOAN N. ERICKSEN
United States District Judge